UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

          *Plaintiff,*

   *v.*                                   Case No. 21 CR 344 (JDB)

ABRAM MARKOFSKI,

          *Defendant.*

## ABRAM MARKOFSKI'S MEMORANDUM
## IN SUPPORT OF HIS SENTENCING RECOMMENDATION

## I.

## INTRODUCTION

On December 10, 2021, Abram Markofski will appear before this Court for sentencing, having pled guilty plea to a violation of 40 U.S.C. § 5104(e)(2)(G), a Class B Misdemeanor, for his actions on January 6, 2021. Abram Markofski respectfully requests that the Court impose a sentence of probation; he has paid the restitution required by the plea agreement, as well as the special assessment. The requested sentence is "sufficient, but not greater than necessary" to meet the objectives of 18 U.S.C. § 3553(a), and accounts for both aggravating and mitigating circumstances of Abram Markofski's conduct, his lack of a prior criminal record,

1

as well as his employment and educational history. To be clear, Abram Markofski is guilty of the offense to which he pled guilty, but as the sentence recommendation suggests, among those who entered the United States Capitol building on January 6, 2021, he is less culpable than others: he did not travel to the District of Columbia with the intent to interfere with Congress, nor did he engage in violence or destruction of government property, he left the Capitol on his own volition, he cooperated fully with investigators and admitted his role in the conduct, and, apart from sending two text messages (one to a friend who was supposed to travel with him; the other to the individual with whom he travelled to the District of Columbia), Abram Markofski did not post accounts of his actions on social media, or use social media to obstruct the investigation of his conduct.

## II.

## FACTUAL BACKGROUND

*The Offense.*  Factually, the case is straight-forward. There is no dispute with the Statement of Facts. Dkt. # 35. Seeing the offense through Abram's perspective may offer some insight that is useful under the factors found in 18 U.S.C. § 3553(a)(1).

In early January, 2021, Abram's friend, Brandon Nelson, contacted Abram about going to a rally in the District of Columbia. Brandon asked if Abram would be interested in travelling to the rally at which President Trump was to speak on

January 6, 2021. Brandon was excited about the rally and Abram decided to join his friend. Abram had heard about President Trump's rallies and thought that, if this is the last one, it'd be interesting to see. Abram thought it'd be a brief road-trip that would allow him to see some sights and spend time with his friend, Brandon, before school began again.

The drive to Washington was uneventful. But Abram recalls that while they were driving President Trump tweeted about the rally and exclaimed that it was going to be wild; Abram didn't think much about the comment at the time, it was just typical hype from President Trump.[1] Abram was not expecting violence. Having arrived in Alexandria, they took the Metro into DC.

Abram was surprised by the number of people. He had not before been exposed to so many people. From a distance, Abram listened to President Trump speak. They were too far away to see the stage, but a video screen let him see the speakers. He noticed that, all around him, the people were excited and agitated. Speakers at the rally told the crowd about the Joint Session of Congress whose purpose was to count the ballots for the Electoral College, and they urged the

---

[1] President Trump announced the rally on Twitter: "Big protest in D.C. on January 6 … Be there, will be wild!" *See* Dan Berry and Sheera Frenkel, *'Be there. Will be Wild!: Trump All but Circled the Date*. THE NEW YORK TIMES (January 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

HURLEY BURISH, S.C.

crowd to go to the Capitol. Abram recalled that President Trump spoke about marching toward the Capitol. When the rally ended, people began to move down road to the Capitol.[2] Abram described the crowd around them as having "high energy." Abram and Brandon followed the crowd. Abram was taken by the buildings he saw as he walked. The architecture impressed him (it was his first visit to the District of Columbia.) They continued walking toward the Capitol.

By the time they arrived, there was a large crowd surrounding the Capitol. The barricades had been pushed aside and the Capitol had been breached.  Abram continued to follow those around him as they walked up the steps and entered the Capitol.  He recalls how noisy it was, with so many people chanting.  He did not see much police presence, though barricades had been pushed aside. Abram and Brandon entered the Capitol through an entrance on the Senate side of the building at about 2:16 p.m. A photograph contained in the complaint, Dkt. 1-1, shows Abram and Brandon after they entered the Capitol (Abram is on the right, wearing a red USA baseball hat).[3]

---

[2]  Even before President Trump concluded his speech, some who had been at the rally, had begun moving toward the Capitol.  The outer barricades at the U.S. Capitol were breached before 1 p.m.

[3]  As can be seen in the photograph, Abram was wearing a backpack.  He brought water, a portable cell-phone charger and food. The backpack did not contain any items that could be considered tactical, such as a gas mask. Abram had not anticipated or planned for anything other than a peaceful trip.

Hurley Burish, s.c.



Abram remained in the Capitol for almost 90 minutes.  Most of the time, he was in the Rotunda. The photo contained in the complaint accurately shows what he did inside the Capitol: Abram walked around and observed the building and people. Abram did not enter any offices, rooms or chambers that were private or closed, as some did. Nor did he engage in any violent or destructive conduct on the Capitol grounds or inside the Capitol. (Abram later saw videos of confrontations between protesters and police; he found those videos were saddening and upsetting.) When they heard that there had been a shooting, he and Brandon voluntarily left.

While Abram did not post any social media messages about his time in the Capitol, he did send a text message that provides a sense of his emotions after having been surrounded by so many people at the Ellipse and at the Capitol. At about 2:49 p.m., Abram texted a friend who had initially planned on travelling

Hurley Burish, s.c.

with Abram and Brandon: "We stormed the Capitol and shut it down. Currently inside still."[4]

According to geolocation data associated with his cellphone, Abram and Brandon remained inside the Capitol until 3:41 p.m. Later, Abram texted his friend, "We left DC and are driving home." Abram and Brandon returned to Virginia and drove back to Wisconsin.

The next day, after they were home, Brandon texted Abram "We held the line … No backing down." Abram replied, "Fuck. Yeah, brother is Patriots won't go down without a fight." Brandon responded, "Not I."

Abram Markofski was contacted by the FBI on January 18, 2021, after a tipster contacted the FBI about Brandon Nelson. Abram voluntarily spoke with the agents. He provided them with access to his phone and social media accounts. He was truthful and admitted that he and Brandon had been in the Capitol on January 6, 2021. On May 3, 2021, he was contacted a second time by the FBI. The agent requested that Abram come by the FBI office before going to class. He complied. Abram was taken into a conference room and arrested. He provided the agents

---

[4]  In that same text thread, Abram's friend asked how many people were there. Abram texted "Also heard 10 million but [I don't know]." Then, "3-5 million, [I'm] hearing." Abram did not have the level of sophistication to realize that the estimate was entirely preposterous. In reality, the number of people who attended the rally was less than at any Green Bay Packers game at Lambeau Field. Inflation of the number who attended the rally reflects what was encouraged by speeches at the rally—a gross distortion of the truth.

6

with the keys to his residence, so they could search it. Shortly after his arrest, the agents provided Abram with a banana and a protein bar. The agents then drove him to the federal courthouse in Madison (about 150 miles away). He was released on conditions immediately after he appeared in Court in Madison. (Brandon was arrested and released on the same day.)[5]

Not long after his arrest, Abram's entry into the Capitol on January 6 caused him to suffer consequences at work, in school and with his service obligations.[6] Days after his arrest, Abram was asked to leave his job at Kwik Trip. Then, the Army National Guard initiated proceedings to remove the security clearances necessary for Abram to do his job in the Army National Guard.[7] Finally, he was

---

[5] Abram was in custody from about 9:30 a.m. to 1:30 p.m., on May 3, 2021.

[6] News of Abram Markofski's arrest (and later guilty plea) was carried by local media. WXOM: *La Crosse County man released on bond after court appearance on charges connected to January 6 Capitol riot,* May 3, 2021, available at https://www.wxow.com/news/crime/update-la-crosse-county-man-released-on-bond-after-court-appearance-on-charges-connected-to/article_103fe856-db32-5e28-925b-e15e6f3ba3e7.html; Steve Rundio, *Markofski fourth active-duty soldier charged in Jan. 6 Capitol riot*, LA CROSSE TRIBUNE, May 7, 2021, available at https://lacrossetribune.com/news/local/crime-and-courts/markofski-fourth-active-duty-soldier-charged-in-jan-6-capitol-riot/article_5284bbd2-e1c0-561a-aaa1-82d643318c47.html; Ed Treleven, *La Crosse man pleads guilty to role in US Capitol riot*, LA CROSSE TRIBUNE, September 1, 2021, available at https://lacrossetribune.com/la-crosse-man-pleads-guilty-to-role-in-us-capitol-riot/article_2b34516f-5df4-5d03-a97d-e1690b8e883b.html.

[7] When Abram's unit was called up for duty by Governor Tony Evers related to the jury verdict in the Kyle Rittenhouse case, Abram was told that he could not join, because of the ongoing security clearance review. The same review also caused the Army to suspend his college tuition reimbursement.

placed on probation by Viterbo University until May 2023 for non-academic misconduct. His family continued to support him, but first he had difficult conversations with his parents about accountability and his role in the events of January 6.

**The Offender.** Abram Markofski is 24 years old and has no prior criminal record. Abram is in his fourth semester of college at Viterbo University in La Crosse, Wisconsin, where he studies engineering. His tuition is paid through his service in the Army National Guard. To help support himself, Abram works about 20 hours a week assembling pallets of produce for a wholesale company; he's paid $19/hour. Abram is the second oldest of eight children (ranging in age from 12 to 26) born to Michele and Douglas Markofski, and since being charged in this case, he has moved back in to his parents' home. Nothing in Abram's past foretold that he would unlawfully enter the United States Capitol on January 6, 2021. But his past does show that he is unlikely to engage in similar conduct again in the future; he has learned and understands why his conduct is considered criminal—and a number of consequences collateral to his criminal conviction have caused him to examine his behavior and demonstrate why he can be trusted.

Abram describes his family as close, loving and supportive. His family moved to La Crosse in 2010, when his father started a church. Abram was involved in the church and attended youth group, youth events, and church-sponsored

8

summer camps. As he got older, Abram became less involved in his father's church, but he regularly attended First Free Church in neighboring Onalaska. It was at First Free Church that Abram met Brandon Nelson, who at the time was a youth pastor.

Growing up, though Abram was homeschooled, he was part of a group of homeschooled families which afforded social opportunities. He played club sports such as lacrosse (beginning in the seventh grade) and later, he ran cross-country for a high school-aged homeschool team. As a senior, Abram played basketball in a home school league. Academics were a priority, and he did well in school, but it also allowed for a flexible schedule. This allowed Abram to work throughout his high school years, beginning with a part-time job at McDonald's when he was 15.

Steady employment has been a constant for Abram. After working at McDonald's, he worked for a car dealer, helping with website ads. Next, he worked for a start-up company as a graphic installer, applying vinyl wraps. Then Abram worked as personal trainer at a gym that was owned by same person as the vinyl wrap company. For a time, he worked in a factory manufacturing railroad ties; the work was hard, but the schedule was flexible. Abram kept this job during his first semester of college.

But after he completed his first semester at Viterbo University, in January 2020, Abram left school for a year in favor of military training. He enlisted in the

HURLEY BURISH, S.C.

Army and completed basic training, infantry and airborne school. Abram then entered the evaluation process to become a special operations soldier at Fort Bragg. While he did not complete special operations training, he was invited to try out again (Abram was considerably younger than most candidates; he was 22 and the average age for a special operations soldier is 34). He sought out the training as the mission set of Army Green Berets attracted him: training other forces allows an individual to have a large impact on world.

Abram returned to Viterbo College in January, 2021. He spent the summer semester taking 12 credit hours of engineering classes at the University of Wisconsin Madison. Now, completing his third semester at Viterbo, he is taking 18 credits hours of classes.

Abram describes himself as dedicated; whether to work, school, employment or fitness. He puts his heart into everything he does. His friends and family describe him as having "a teachable mind," "generous," having a strong work ethic, and as having leadership potential.[8] Abram is a "blessing to our family," writes Doug Markofski, his father. He sees Abram focused on doing the right thing and that Abram "humbly learns from his mistakes." His mother, Michele, speaks to one of his better qualities, "his teachable mind." Since he has

---

[8] Letters from family, friends and military superiors are attached as *Exhibit A*. Attached as *Exhibit B* is Abram Markofski's written allocution.

HURLEY BURISH, S.C.

been living at home, again, he has spoken with his mother about the criminal case and how it weighs heavily on him. She writes, "Learning some hard lessons during this time has given him a perspective that is more diverse and focused."

Soldiers with whom he works support him. Abram has discussed his conduct with them. Platoon Sergeant Tristan Babl writes that he does not "have any concerns with PFC Markofski's continued service in my platoon. If given the opportunity to continue his career, I have no doubt that he would continue to be an invaluable asset to his unit and the WIARNG."

No one describes Abram as politically engaged or obsessed with social media.

In his written allocution Abram Markofski acknowledges that seeing the violence that was occurring at the same time as he was inside the Capitol affected him and made him understand that his misconduct was more serious.

> When I got home, I saw the videos of people attacking the police. I saw videos of the National Guard turning out. That hit me hard. My actions put me on the other side of the line from my brothers in the Army. The wrong side. Had I lived in the area, I would have been called up to defend the Capitol and restore order. That's what I took an oath to do, but my actions put my oath into question. My actions brought dishonor to my beloved U.S. Army National Guard.

He succinctly "accept[s] responsibility for entering and remaining in the Capitol. It was wrong and unlawful. I offer my sincere apology to the Court, the government, and those police officers who were there, trying to keep order."

Hurley Burish, s.c.

# III.

## LEGAL BASIS FOR SENTENCE

Abram Markofski faces up to six months in jail and a fine of up to $5,000. 40 U.S.C. § 5109(b); 18 U.S.C. § 3571(b). A term of probation of up to five years may be ordered. 18 U.S.C. § 3561(c)(2); PSR, ¶ 77.

The advisory sentencing guidelines do not apply to a conviction for a Class B misdemeanor offense. U.S.S.G. § 1B1.9. The Court must determine an appropriate sentence based on the circumstances and under all of the § 3553(a) factors, "not all of which will point in the same direction." *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.D.C. 2008).

Sentencing is based on "the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). "Highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* at 480 (quoting *Williams*, 337 U.S. at 247). This principle is codified in 18 U.S.C. § 3553(a), which requires that any sentence imposed be "sufficient, but not greater than necessary" to serve the sentencing goals of punishment, deterrence, protection of the public, and rehabilitation, which requires the Court to consider "the history and characteristics of the defendant."

12

## IV.

## DISCUSSION

Abram Markofski did not drive from Wisconsin to the District of Columbia planning on unlawfully entering the Capitol or breaking the law. While he had no role in any of the violence that happened that day, his presence in the Capitol made the work of the police more difficult and emboldened others. Abram Markofski accepts responsibility for entering and remaining in the Capitol without permission or authority. He deeply regrets his actions and is saddened by videos of violence that he has since seen. As his mother noted, Abram "humbly learns from his mistakes," and he has been "Learning some hard lessons."

Abram Markofski, at age 24, shows great promise in the eyes of his family and military superiors. He comes from a close-knit family, he has a strong work ethic and believes in service to the country. He works 20 hours a week and takes 18 credit hours of college engineering classes. Because of about ninety minutes that he spent inside the United States Capitol on January 6, 2021, he has placed his future at risk—his schooling, foremost. His actions on January 6, 2021, while unlawful, were neither aggressive nor malicious. A sentence to a term of probation is sufficient, but not greater than necessary, to accomplish the purposes of sentencing. Moreover, such a sentence is consistent with other sentences that have been imposed in related cases for similarly-situated defendants and reflects the

HURLEY BURISH, S.C.

seriousness of his conduct, promotes respect for the law, just punishment and adequate deterrence.

*Nature and Circumstances of Conduct.* As contemplated by 18 U.S.C. § 3553(a), each defendant's conduct must be assessed on a spectrum. In determining a fair and just sentence on this spectrum, this Court should look to a number of critical facts, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. These factors are neither exhaustive, nor dispositive, but they help place each individual on a spectrum as to their fair and just punishment. Evaluation of these factors shows that a term of probation alone is sufficient and not greater than necessary in Abram's case.

The facts show that Abram Markofski entered the Capitol through a door on the Senate side of the building. He followed hundreds of others who walked in ahead of him (and behind him). In the almost 90 minutes that he spent inside the

14

Capitol, he walked around the building, spending most of his time near the rotunda. He did not enter any offices, rooms or other secure places. He did not engage in any acts of violence or destruction. He left voluntarily when he learned that there had been a shooting. While his presence in the building was unlawful, he remained peaceful at all times.  When he was contacted by the FBI, Abram was cooperative and truthful. He took responsibility for his entry into the Capitol and truthfully described his actions. He provided his phone and access to social media to the FBI and he never attempted to obstruct or destroy evidence. In his statement to the FBI and in his guilty plea he has demonstrated acceptance of responsibility. Finally, neither before or after January 6, and aside from two text messages, Abram did not use social media to post messages about January 6. Within 90 days of his first appearance in this Court, he was prepared to plead guilty.

Abram Markofski attended the rally and followed other attendees as they walked from the Ellipse to the Capitol. He did not organize the trip from Wisconsin and he certainly had no role in organizing the rally or movement of attendees from the Ellipse to the Capitol. He did not break through barricades, windows or doors to enter the Capitol building. He did not carry weapons, protective gear or communications equipment. Nor did he witness any of the violent clashes that preceded entry onto the Capitol building. He was caught-up in the moment, having listened to fiery and provocative speeches about the

HURLEY BURISH, S.C.

election that urged the attendees to go to the Capitol. He entered the building and spent almost 90 minutes walking around inside of the building. Though his entry and presence in the Capitol was unlawful, the nature and circumstances of his conduct do not warrant more than a term of probation.

*A Term of Incarceration is Greater than Necessary*. Abram Markofski has no prior record, so he has never served a term of incarceration. A term of incarceration is not necessary for him to understand that his offense was serious or to punish him, as common sense informs that jail has greater significance for those who are imprisoned for the first time. *See United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (noting that generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (concluding that a below-guideline sentence of two months' imprisonment and four months home confinement for a defendant who had never been confined was sufficient to impress on him the seriousness of his crime and deter him from re-offending).

The sentence recommendation is not without an appropriate amount of punishment. The Supreme Court has observed that probation is itself a meaningful punishment. *Gall v. United States*, 552 U.S. 38, 48-49 (2007). Offenders are subject to standard conditions that substantially restrict their liberty. *See United States* v. *Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that

probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin* v. *Wisconsin*, 483 U.S. 868, 874 (1987))). Moreover, probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of crimes, and refrain from many activities that could present a risk of re-offense.[9] Probation is a meaningful punishment that addresses concerns relating to public safety and assures that he remains on-track with his education and employment.

> *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.* There is no dispute that the attack on the U.S. Capitol building, and all that it involved, was an attack on the rule of law. Nevertheless, as with the nature and circumstances of the offense, and the defendant's history and characteristics, this factor does not require a sentence of incarceration. A term of probation does not threaten or promote disrespect for the law. "A sentence of imprisonment may work to promote not respect, but derision of the law, if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct in circumstances involved in

---

[9] For the sake of completeness, Abram Markofski notes that the Probation Office concluded that his history does not support the need for transitional services available only through the Bureau of Prisons. PSR, ¶ 81.

sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007). Abram Markofski notes that with his guilty plea, his admission of wrong-doing (at the first instance to the FBI and then the Court through his guilty plea), he acknowledges respect for the rule of law.

The requested sentence also provides for just punishment: Abram Markofski will be punished. He suffers the shame that attends a criminal conviction, and he will never be trusted in the same way again by the community and his continued enrollment in college and service in the military have been placed in jeopardy. His entry into the Capitol has earned him infamy, which he would immediately trade for the respect that he lost by his actions.

Moreover, a sentence to a term of probation is just considering the collateral consequences that Abram has already faced, including the loss of employment, being placed on probation at his university and undergoing a review to determine whether he should remain in the military. The media coverage of his arrest, appearance in court and guilty plea has caused him to withdraw from engaging with others, fearing that they'd learn about his involvement in the events of January 6. However, by the same token, having to explain his misconduct to his university and his superiors in the military has required him to acknowledge and engage in introspection and examination of why he engaged the behavior. All to whom he has spoken about this subject have found him to be sincere and

18

acknowledging of his misconduct. This level of self-reflection and being held to account in different parts of his life show that public safety has been addressed.

***The Need for the Sentence to Afford Adequate Deterrence.*** Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). In similar cases, the government has argued that deterrence is an important aspect of the sentence imposed. Abram Markofski offers the following observations in anticipation of the government's argument.

Given Abram Markofski's history and characteristics specific deterrence does not require a period of incarceration. As for deterrence and just punishment, a term of incarceration (rather than a term of probation) will have no more specific deterrent effect on him. Deterrence, both specific and general, has already been accomplished by this public prosecution. Abram Markofski has been convicted of committing a crime; and this mark will remain on his record as he seeks employment and advancement for many years; the actual criminal conviction is itself a strong punishment, which is why the government would not allow dispositions without adjudications in these cases.

General deterrence is commonly offered as a basis for a significant sentence. This theory of punishment suggests that offenders turn to crime because they view

the benefits of crime as outweighing the costs of crime. The theory provides that by applying a deterrence rationale the punishment imposed in the case at bar dissuades would-be criminals from engaging in criminal activity by increasing the costs of crime, relative to the benefits. "Acceptance of deterrence as a theory of punishment benefitting both the individual and society, however, illustrates a misunderstanding of the available literature on the subject." Katelyn Carr, *An Argument Against Using General Deterrence as a Factor in Criminal Sentencing*, 44 CUMB. L. REV. 249, 250 (2014).

A number of problems exist with general deterrence and its underlying premise. For example, the decision to commit crime is not always a rational decision; any number of conditions interfere with the rational calculation of self-interest by potential offenders. The literature on this subject demonstrates that amplifying sentencing severity in the cause of deterrence is unavailing; increasing the sentence severity does not amplify the deterrent effect. While it is flawed to use the threat of increased sentences to effectuate individual perceptions of a high certainty of punishment, increasing perceptions of sentencing certainty can be accomplished long before the sentencing stage.

Evidence suggests that "perceptions [about the risk of getting caught] are sensitive to the outcomes of behavior." *Id.* at 266. Studies show that offenders are rational in one sense: they are affected by their perceptions about the risk of getting

caught for misconduct. So, while increasing the severity of sanctions does not dissuade offenders from engaging in criminal activity, increasing the perception of the likelihood of incurring those sanctions has a positive deterrent effect. In this regard deterrence has already been accomplished in this case. The fact that Abram Markofski and more than 650 others have been prosecuted has deterrent value—this is the deterrent effect that matters. Whatever sentence is imposed, it is unlikely that the sentence will affect another offender's perceptions of the likelihood of getting caught; and, therefore, it will not have an appreciable deterrent effect.[10] But the fact that Abram Markofski was prosecuted and held accountable will have a deterrent effect.

Finally, applying deterrence theory to sentencing raises a moral and philosophical problem: if sentencing is based on the circumstances of the defendant's offense and characteristics why should the Court punish a defendant not as a result of his behavior, but to benefit another. In this sense, punishment of the individual amounts to treating him not as an end, but simply as a means: punishing an individual to deter societal crime uses that individual for the purpose of bettering others. This violates the fundamental concept of punishing a

---

[10] *See United States v. Gardellini*, 545 F.3d 1089, 1095 (D.D.C. 2008) ("In light of the discretion afforded to district courts by the Supreme Court's sentencing decisions, only a fool would think that he or she necessarily would receive the same sentence [ ] for a similar [ ] offense.").

HURLEY BURISH, S.C.

person for their actions as required by 18 U.S. Code § 3553(a).[11] So, while deterrence is part of the rationale this Court may use in arriving at an appropriate sentence in this case, the fact that Abram Markofski was arrested, charged and convicted is the strongest deterrence, not the actual sentence imposed.

Increasing the severity of punishment for purposes of general deterrence may be consistent where a defendant sought to stand out while engaging in misconduct.[12] Or, where the defendant's misconduct stood apart from other defendants, because it was depraved or a showed a lack of understanding.[13] But where the defendant didn't seek notoriety based on his misconduct, and his conduct was not violent, dangerous or unique, then general deterrence doesn't require incarceration.

---

[11]   *See id.*, 545 F.3d at 1100 (Williams, J., dissenting) (Arguing in support of deterrence, but noting that "basing a person's punishment on that punishment's impact on other people indeed raises ethical issues.").

[12]   *See, e.g., United States v. Jacob Chansley*, 21cr3 (Hon. Royce C. Lamberth) (Chansely, known as the Q-Shaman, pled guilty to 18 U.S.C. § 1512(c)(2)).

[13]   *See, e.g., United States v. Derek Jancart and Erik Rau*, 21cr467 (Hon. James E. Boasburg) (sentenced to 45 days in custody—DOJ recommended 4 months—citing that the men came to D.C. with gloves, gas masks and two-way radios. Additionally, Jancart posted videos on Facebook where he can be heard laughing at police and Mr. Rau can be heard screaming "we have you surrounded!" At the time, Mr. Rau was already serving a term of probation for domestic violence); and *United States v. Matthew Mazzocco*, 21cr54 (Hon. Tanya S. Chutkan) (sentenced to 45 days in custody; Mr. Mazzocco blamed violence on Antifa and deleted his social media accounts in an effort to obscure his actions and refused to give law enforcement access to the body-worn camera he wore on January 6, 2021, claiming that he did not know where it was.).

Hurley Burish, s.c.

Nor is additional specific deterrence merited here.  Abram's conduct was mitigated.  And when he was contacted by the FBI, he cooperated with investigators, acknowledged his misconduct, and accepted responsibility. His arrest, transport in the back of a squad car for almost 150 miles, booking and appearance in court in handcuffs was more than was needed to make the point that his misconduct was criminal. For someone with no prior contact with law enforcement, the arrest made a significant impression.

*Creating Unwarranted Disparity*. Under 18 U.S.C. § 3553(a)(6), the court seeks "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Given the number of defendants charged with misdemeanor offenses arising from their entry into the Capitol on January 6, there exists an ever-growing number of defendants whose conduct mirrors that of Abram Markofski which the Court may use as a reference. The circumstances of each defendant, of course, are unique. But it is difficult to distinguish Abram Markofski from other cases where no term of incarceration was imposed. There is little that materially distinguishes Abram Markofski's conduct from those cases. Where sentences imposed for the same offense conduct have included terms of incarceration (including home confinement), the offense conduct usually involved factors not present in this case: defendants who came prepared for a violent confrontation, posted to social media, or obstructed the

HURLEY BURISH, S.C.

investigation, for example. *See* n.14, *supra*. Abram Markofski's conduct falls toward the mitigated, low-end of the spectrum of individuals who have been prosecuted in the District Court. He is among those who unlawfully entered the Capitol, but did not engage in aggravating conduct; he merits the imposition of a term of probation along with restrictive mandatory and discretionary conditions, but not a term of incarceration. Moreover, in two important aspects of his life (education and service to country), he is already subject to discipline as a result of the same conduct.

## V.

## CONCLUSION

For the reasons he explains here, Abram Markofski respectfully requests that the Court sentence him to a term of probation. Restitution and a special assessment are also required, but have already been paid. Such a sentence is appropriate because it holds him accountable for his conduct; neither Abram Markofski's background nor his conduct require incarceration as a component of the sentence imposed in order for the sentence to satisfy the objectives of 18 U.S.C. § 3553(a).

24

Dated this 2d day of December, 2021, at Madison, Wisconsin.

Respectfully submitted,

ABRAM MARKOFSKI, *Defendant*

*Electronically signed by Jonas B. Bednarek*
Jonas B. Bednarek
*Wisconsin Bar No.*1032034
HURLEY BURISH, S.C.
P.O. Box 1528
33 E. Main Street, Suite 400
Madison, WI 53701-1528
(608) 257-0945
jbednarek@hurleyburish.com

## CERTIFICATE OF SERVICE

I certify that this document was filed by ECF so that a copy of the same was transmitted to both Assistant United States Attorney Seth A. Meinero and United States Probation Officer Crystal S. Lustig in an electronic format.

Dated this 2d day of December, 2021.

*Electronically signed by Jonas B. Bednarek*
Jonas B. Bednarek

F:\-clients\markofski abram\pleadings\sentencing memorandum FINAL.docx

25

HURLEY BURISH, S.C.