## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-344-2 (JDB)** |
| | : | |
| **ABRAM MARKOFSKI,** | : | |
| | : | |
| *Defendant.* | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Abram Markofski to 14 days of incarceration and $500 in restitution.

### I.   Introduction

Markofski participated in the January 6, 2021, attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $1.4 million worth of property damage.

Markofski stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law-enforcement officials, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

The government is requesting 14 days of incarceration based on an assessment of relevant sentencing factors. Despite witnessing substantial evidence of a riot and destruction of property

at the Capitol, Markofski—a member of the Wisconsin Army National Guard—unlawfully entered the building at the Senate Wing Door, less than five minutes after rioters had smashed windows on either side of the doorway to gain entry.  He and his friend and codefendant, Brandon Nelson, remained inside and entered different parts of the building for well over an hour, an unusually long incursion compared to other Capitol-breach defendants.  While still inside the building, he bragged in a text message that he had "stormed the Capitol and shut it down."  After the riot, Nelson texted him that they had "held the line" and did not "back[] down."  Markofski agreed and expressed his belief this behavior was patriotic.  At the same time, Markofski submitted to three voluntary interviews with the Federal Bureau of Investigation ("FBI") (though he minimized his conduct in his post-arrest interview), produced video and photo evidence of his time at the Capitol and the unlock code to his cellphone, alerted the FBI to where items of evidence were located in his residence and car, and expressed a prompt desire to accept responsibility.

## II.   <u>Factual and Procedural Background</u>

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the Capitol in ECF No. 35, at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### *Markofski's Role in the January 6, 2021, Attack on the Capitol*

Abram Markofski and his friend Brandon Nelson traveled from the Madison, Wisconsin, area to attend the rally President Donald Trump planned to hold in Washington, D.C., on January 6, 2021.  After arriving in Washington and attending the rally, they eventually made their way to the Capitol together.

According to Nelson, when he and Markofski arrived at the Capitol grounds, he observed people "standing on scaffolding" and officers "shooting pepper balls" at those people for about 45 minutes to an hour. "At a certain point," Nelson related, the officers "weren't there anymore," "barricades [were] removed," and a "flow" of individuals began entering the building, and he and Markofski were "part of that crowd."

Capitol surveillance video showed Markofski and Nelson entered the Capitol at the Senate Wing Door—where rioters had smashed windows beside the doors at approximately 2:12 p.m.— at approximately 2:16 p.m. Approximately 15 seconds before they crossed the threshold, a rioter could be seen climbing through a broken window (circled in red) as other rioters cascaded through the doorway without any manner of security screening, as pictured below:



The two sequential screenshots, plus a closeup of the second screenshot, below, show Markofski, wearing a dark windbreaker, a khaki backpack, and a red ballcap turned backwards, and Nelson crossing inside the Senate Wing Door (both circled in yellow), with visible broken glass and debris on the ground beneath both windows on either side of the doorway:







Capitol surveillance video captured Markofski and Nelson inside the Capitol Crypt at approximately 2:20 p.m.  Shortly before they arrived there, the video shows rioters converged on a line of officers in the Crypt, and within minutes, the officers were overwhelmed.  At one point, Markofski held up his cellphone in the area and nodded his head affirmatively as others appeared to chant, and Nelson clapped his hands for a couple seconds, as depicted in these screenshots (circled in yellow in first screenshot):





Other rioters at the front of this mob scuffled with officers.  By 2:25 p.m., rioters overran the officers in the Crypt, the defensive line broke, and the mob gained access to other parts of the building.

6

At approximately 2:49 p.m., Markofski texted another individual, "We stormed the Capitol and shut it down.  Currently inside still."  Nelson told the FBI that he and Markofski had spent about 20 minutes in a domed room—later confirmed to be the Rotunda—"before following the crowd into another room."  At some point, police officers "started to push back and attempt to clear the rooms," so Nelson "started walking backwards" and left the Capitol through "smashed" doors adjacent to the Rotunda—later confirmed to be the Rotunda Doors—"at approximately 3:30 p.m."  Video evidence confirmed that windowpanes in those doors had been shattered earlier that day.

Geolocation data associated with Markofski's cellphone obtained from Google indicate that Markofski was inside the Capitol from approximately 2:15-3:41 p.m.  These data are consistent with the surveillance video depicting him and Nelson entering the Senate Wing Door at 2:16 p.m., and the time that Nelson admitted he left the building, which was around 3:30 p.m.  The location data are also consistent with the areas where surveillance video confirmed Markofski and Nelson had entered, including the Senate Wing Door and the Crypt; where Nelson said they traveled, the Capitol Rotunda; and where Nelson said he exited the building, the Rotunda Doors.

After the riot, Markofski and Nelson drove back to Wisconsin.  From approximately 1:19-1:20 a.m. (CST) on January 7, 2021, Nelson texted Markofski, "We held the line . . . No backing down."  Markofski replied, "Fuck. Yeah, brother is Patriots won't go down without a fight."  Nelson responded, "Not I."

The FBI did not uncover evidence that Markofski engaged in violent or destructive conduct at the Capitol grounds or inside the Capitol.  Markofski submitted to voluntary interviews with the FBI both before and after his arrest.

*Markofski's Interviews with the FBI*

According to the FBI, in his first pre-arrest interview on January 25, 2021,[1] Markofski stated when he and Nelson got to the Capitol grounds, there were "thousands of people" near some scaffolding.  At first, he saw "a few police officers" near a set of double doors.  He and Nelson walked "around the corner" from there to view the crowds, and when they returned, "the police near the double doors were gone and both doors were open."  He and Nelson "walked in with the crowd and walked around inside the Capitol," including to a "'main room' where there was a mass of people inside chanting."   Markofski admitted at one point, a police officer was blocking off a hallway.  The officer told him and Nelson, "'I can't make you guys leave, however for your safety you should leave.'"

During his second pre-arrest interview with the FBI on February 9, 2021, Markofski produced video and photo evidence from his cellphone depicting images from the Capitol.

In his post-arrest interview with an FBI agent on May 3, 2021, the agent informed him he was under arrest pursuant to a misdemeanor warrant from Washington, D.C.  Markofski expressed incredulity he was being arrested when "no law enforcement had stopped [him] from entering the building, and there's no 'No Trespassing' signs put up."  During the interview, the agent showed Markofski a photo depicting him inside the Capitol on January 6, and Markofski confirmed it was he.  He also told the agent where evidentiary items to be seized pursuant to a search warrant could be located in his car and residence and provided the unlock code to his cellphone.

Markofski knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

---

[1] Quotations from the pre-arrest interview are derived from FBI's summary of what Markofski stated and not Markofski's verbatim statements.

*The Charges and Plea Agreement*

On April 27, 2021, Markofski was charged by complaint with violating 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2). On May 3, 2021, he was arrested after he turned himself in to the FBI in Wisconsin. On May 6, 2021, Markfoski was charged by an Information with four counts, violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 1, 2021, he pleaded guilty to Count Four of the Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G). In his plea agreement, Markofski agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   **Statutory Penalties**

Markofski now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. Markfoski must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559(a)(7); U.S.S.G. §1B1.9.

### IV.   **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

### A.  The Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.  So too does the conviction this defendant now faces.  Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 was not like picketing at the Capitol some other day, without other or with relatively few rioters present.

All defendants should be sentenced based on their individual conduct.  But this Court should note that each person who entered the Capitol on January 6 did so under the most extreme of circumstances, and Markofski is no exception. As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law-enforcement officials and smelled chemical irritants in the air.

In that context, Markofski's crime, although a misdemeanor, was serious.  Nelson, who traveled with Markofski to the Capitol, admitted to the FBI that he spent considerable time outside the Capitol before entering.  Among the things he saw were people "standing on" and "cutting into the scaffolding" and police officers "shooting pepper balls" at rioters for about an hour.[2] Markofski corroborated Nelson's account when he recalled "thousands of people" near scaffolding, though he focused more on the absence of objective indications they were not allowed inside the building.   Five minutes before Markofski entered the Senate Wing Door with Nelson, rioters had smashed windows on either side of that entryway.  Broken glass and debris lay about

---

[2] Nelson gave a more extensive account than Markofski did of what they observed before entering the building.

the ground on both sides of the doorway.  Just 15 seconds before they entered, a rioter had climbed through one of the broken windows.  Despite glaring evidence of a riot before he even set foot in the building, Markofski still decided to enter the besieged Capitol with Nelson at approximately 2:16 p.m.

While looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

What distinguishes Markofski from many other rioters who entered the Capitol is the duration of his time inside the building.  Many rioters charged with unlawfully entering the Capitol spent a matter of minutes inside the building.  Numerous defendants spent 10 minutes or less

inside.[3]  Others spent no longer than 30 minutes inside.[4]  By contrast, Markofski spent over 80 minutes in multiple parts of the building, including the Crypt and the Rotunda.

During this significant incursion, Markofski nodded his head affirmatively while the mob in the Crypt appeared to chant.   Within 10 minutes of Markofski's arrival in the Crypt, this mob overran a defensive line of officers and gained access to other parts of the Capitol.   At approximately 2:49 p.m., he boasted in a text to a friend, "We stormed the Capitol and shut it down."  Markofski admitted in his first pre-arrest interview with the FBI that an officer told him he should leave the Capitol because it was unsafe inside the building.  Nelson stated that he and Markofski were in the Rotunda for approximately 20 minutes, before police officers "started to push back and attempt to clear the rooms."  Geolocation data indicate Markofski finally left the building around 3:41 p.m., through doors Nelson noticed—and video evidence confirmed—had "smashed" windowpanes.

The length of Markofski's stay inside the Capitol is of particular concern to the government.  Every person who entered the building contributed to beleaguering the police officers who desperately defended the building, public officials, and other Capitol employees during a violent siege.  Markofski's decision to remain inside for well over an hour—much longer than

---

[3] *See., e.g., United States v. Valerie Ehrke,* 21-cr-00097 (PFF) (defendant entered Capitol for approximately one minute or less); *United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (approximately five minutes); *United States v. Sean Cordon,* 21-cr-00269 (TNM) (approximately five minutes); *United States v. Jonathan Sanders,* 21-cr-00384 (CJN) (approximately five minutes); *United States v. Kevin Cordon,* 21-cr-00277 (TNM) (approximately five minutes); *United States v. Leonard Gruppo,* 21-cr-00391 (BAH) (approximately six minutes); *United States v. Erik Torrens,* 21-cr-00204 (BAH) (approximately 10 minutes); *United States v. Frank J. Scavo,* 21-cr-00254 (RCL) (approximately 10 minutes); *United States v. Jennifer Ryan,* 21-cr-00050 (CRC) (approximately 10 minutes).

[4] *See, e.g., United States v. Donna Sue Bissey,* 21-cr-00165 (TSC) (defendant entered Capitol for a little over 10 minutes); *United States v. John Wilkerson,* 21-cr-00302 (CCC) (approximately 20-25 minutes); *United States v. Andrew Bennett,* 21-cr-00227 (JEB) (approximately 30 minutes); *United States v. David Mish,* 21-cr-00112 (CJN) (approximately 30 minutes).

many others who entered for a relatively brief period—sets him apart from others, and exacerbated the threat posed to everyone at the Capitol on January 6.  This is an aggravating factor.

Despite Markofski observing all the chaos and destruction at the Capitol, his texts with Nelson show that he initially neither felt remorse about breaching the Capitol nor believed what happened was wrong.  Rather, they were proud.  They both believed, as Nelson texted early in the morning of January 7, 2021, they had "held the line . . . No backing down."  Further troubling, they both seemed to feel what they did was patriotic.  Markofski replied to Nelson's text, "Yeah, brother is Patriots won't go down without a fight."  Nelson responded, "Not I."

The government has no evidence that Markofski personally engaged in any violence or destruction of property.  Nor did he conceal evidence from the FBI.  To the contrary, he voluntarily submitted to pre-arrest and post-arrest interviews with the FBI, though he did minimize his conduct during the post-arrest interview, expressing incredulity that he could be charged with a crime because "no law enforcement had stopped [him] from entering the building, and there's no 'No Trespassing' signs put up."  In the context of what happened at the Capitol—especially considering Nelson's account of what they saw outside the building, that windows were smashed on either side of the doors Markofski and Nelson entered, and that Markofski used the language "stormed the Capitol and shut it down" to boast of his entry—this incredulity was misplaced.

The government credits Markofski with consenting to three interviews, providing video and photo evidence to the FBI, identifying where evidence was located in his residence and car, and providing the unlock code to his cellphone.  In addition, at an early point after he was charged, Markofski, through his counsel, expressed a desire to plead guilty.  The government gives significant weight to his desire to resolve his case promptly.  However, Markofski's aggravating conduct—especially his entry despite seeing evidence of a riot and destruction and being a member

of the Wisconsin Army National Guard, the unusually long duration of his incursion, and his apparent lack of remorse shortly after the breach—weigh in favor of a short period of incarceration.

Accordingly, the nature and circumstances of the offense establish the need for 14 days of incarceration here.

### B.  The History and Characteristics of the Defendant

As set forth in the Presentence Report ("PSR"), Markofski does not have a prior criminal conviction.  PSR at 7.  He would have zero points if the Sentencing Guidelines applied to his offense of conviction. USSG § 4A1.2(c)(2).  Accordingly, he would be in Criminal History Category I. USSG §§ 4A1.1, 5A.  In addition, he has complied with all conditions of pretrial release.  PSR at 4.  These factors support a more lenient sentence.

Markofski has been enlisted in the Wisconsin Army National Guard since 2019.  PSR at 10.  His service to the Nation deserves the highest praise.  But his military career also renders his participation in the Capitol riot—an event that threatened the Constitutional principles he swore an oath to protect and defend—even more troubling.  In his statement to the Court attached to the defense's sentencing memorandum, Markofski acknowledges that his "actions put my oath in question" and "brought dishonor to my beloved U.S. Army National Guard."  ECF No. 44 (Exh. B).  This is an appropriate expression of contrition.  However, his boast from inside the Capitol that he had "stormed the Capitol and shut it down" and characterization of this conduct, after some time to reflect, as "Patriot[ic]" is disturbing and aggravating.[5]

---

[5] At least one judge of this Court has factored sincere but belated contrition when imposing a sentence of incarceration for a Capitol rioter.  In *United States v. Matthew Mazzoco,* 21-cr-00054 (TSC), Judge Chutkan stated at sentencing, "Mr. Mazzoco's remorse—and I believe his remorse is sincere— . . . didn't come when he left that Capitol. It didn't come when he went home.  It came when he realized he was in trouble.  It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.  It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions." 10/4/2021 Tr. at 29-30.  The Court imposed a sentence of 45 days of incarceration in that case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-00238 (TFH), Tr. 8/4/2021 at 3 (As Judge Hogan noted, "As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected.")  This factor also weighs in favor of incarceration for a defendant like Markofski, who disregarded the glaring signs of a riot outside the Capitol, entered and remained inside the building for well over an hour, and was proud he and Nelson "held the line" and did not "back[] down."

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most

---

[6] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at:  https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-00188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70.

Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 21-cr-00041 (CJN), Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See Hodgkins*, Tr.  at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").  And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is also a need for specific deterrence here.  On the early morning of January 7, 2021, Markofski and Nelson texted each other and unregretfully expressed their beliefs—despite all they had seen and done for a prolonged period outside and inside the Capitol—that they had "held the line" and performed some sort of patriotic duty.  In addition, Markofski minimized his conduct during his FBI interview.  While Markofski has since expressed remorse for his conduct in the exhibit attached to his sentencing memorandum, his evolving level of contrition still speaks to the need for specific deterrence here.

Both the need to deter generally and Markofski specifically favor incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law-enforcement officers, to conspiracy to corruptly interfere with Congress.[7]  Each offender must be sentenced based on his or his individual circumstances, but with the backdrop of January 6 in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not necessarily become the default.[8]

---

[7] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *Morgan-Lloyd*, 21-cr-00164; *Ehrke*, 21-cr-00097; and *Bissey*, 21-cr-00165.  The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given

Indeed, this Court has admonished that it did not "want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Markfoski has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, and picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. But the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply.

For one thing, although all the other defendants listed in the table attached to this memorandum participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long the defendant remained inside, the nature of any statements the defendant made (on social media or otherwise), whether the defendant destroyed evidence of participation in the breach, *etc.*—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct," but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law

---

the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted). The government made no such agreement in this case.

enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1364-65 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); s*ee id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on codefendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law-

enforcement officials, and a large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol-breach offenses is an appropriate group for purposes of measuring disparity of any future sentence. As the number of sentences in the Capitol-breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

Here, in considering unwarranted disparities, the Court may consider *United States v. Donna Sue Bissey,* 21-cr-00165 (TSC).  Bissey, a 53-year-old with no prior criminal history, entered and remained in a limited part of the Capitol for under 10 minutes, a mere fraction of the time Markofski spent inside.  Like Markofski, she was aware the rioters were destroying or had destroyed property at the building, and she cooperated with the FBI after she was arrested.  In one regard, her conduct was more aggravating because she publicized her pride in breaching the Capitol by posting statements and photos of the riot on Facebook, including announcing she had "No Shame."  By contrast, Markofski shared his pride in taking part in the riot in private texts to friends.  The Court imposed a sentence of 14 days of incarceration, 60 hours of community service, and the recommended restitution.

Another case the Court can consider is *United States v. Thomas Vinson,* 21-cr-00355 (RBW).  Vinson—an oil-company employee with four years of service in the U.S. Air Force who had two operating-a-vehicle-under-the-influence convictions from 1992 and 1996—entered the Capitol with his wife at the exact same location as Markofski, the Senate Wing Door, and around the same time, at approximately 2:18 p.m.  He left the building about 32 minutes later.  Like

Markofski, he cooperated with the FBI by submitting to a voluntary interview.  Unlike Markofski, he produced some evidence to the FBI but may have concealed the worst evidence from his cellphone.  Vinson also witnessed at least two instances where rioters overwhelmed officers, one of which resulted in the brutal breach at the Rotunda Doors around 2:38 p.m.  The Court imposed a sentence of five years of probation (without home detention), a $5,000 fine, 120 hours of community service, and $500 restitution.  Vinson's conduct is easily distinguishable from Markofski's because he spent well under half the time Markofski spent inside the Capitol.

In addition, the Court can consider *United States v. John Lolos,* 21-cr-00243 (APM). Lolos—a 48-year-old owner-operator of a security company who had a prior adjudication of guilt for threatening to kill a woman from 2010—crawled through a broken window, chanted at police, waved flags, and remained in the Capitol for approximately 43 minutes.  Lolos finally left after he saw heavily armed officers in the Capitol.  He also boasted on social media after he exited the Capitol, "They left!  We did it!"  While Markofski observed destruction at and inside the Capitol, Lolos engaged in arguably more aggravating conduct by leveraging the destruction and climbing through a broken window.  Lolos's criminal history, waving flags and chanting at police inside the Capitol, and boasting on social media are also more aggravating than some of Markofski's conduct.  Yet Lolos remained inside for about half the time Markofski was inside and did not have military service in his background, factors that are more aggravating for Markofski.  The Court sentenced Lolos to 14 days of incarceration, the same amount of time the government seeks for Markofski.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "'only one of several factors that must be weighted and balanced,'" and the degree of weight is "'firmly committed to the discretion of the sentencing judge.'" *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012) (quoting *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006)). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

After a review of the applicable § 3553 factors, the government believes that a 14-day term of incarceration and the agreed-upon $500 restitution is appropriate here.

### V.   <u>Conclusion</u>

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).   As detailed above, the factors support a short sentence of incarceration. Balancing these factors, the government recommends that this Court sentence Markofski to 14 days of incarceration, $500 in restitution, and the mandatory $10 special assessment.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing a modest term of incarceration as a consequence of his behavior, while recognizing his early acceptance of responsibility and other mitigating conduct.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Seth Adam Meinero*
        SETH ADAM MEINERO
        Trial Attorney (Detailee)
        D.C. Bar No. 976587
        United States Attorney's Office for the
          District of Columbia
        202-252-5847
        Seth.Meinero@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 6, 2021, I served a copy of the foregoing on all

parties to this matter as listed in the Court's Electronic Case Files system.

*/s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)